[Cite as *Keen v. Wilson*, 2019-Ohio-2398.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STACY D. KEEN, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2018-T-0078** |
| DANIEL E. WILSON, | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Domestic Relations Division, Case No. 2012 DR 00371.

Judgment: Affirmed.

*James D. Franks*, 3637 State Route 5, Suite 6, Cortland, OH 44410 (For Plaintiff-Appellant).

*Debora K. Witten*, Witten & DeMatteis, 173 West Market Street, Warren, OH 44481, *Anthony G. Rossi* and *Brendan J. Keating*, Guarnieri & Secrest, P.L.L., 151 East Market Street, P.O. Box 4270, Warren, OH 44482, and *Elise M. Burkey*, Burkey, Burkey & Scher Co., L.P.A., 200 Chestnut Avenue, N.E., Warren, OH 44483 (For Defendant-Appellee).

MARY JANE TRAPP, J.

{¶1} Appellant, Stacy D. Keen ("Ms. Keen"), appeals from the judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, denying her motion for a new trial and adopting the magistrate's decision that terminated the parties' shared parenting plan for their two minor children and named appellee, Daniel E. Wilson ("Mr. Wilson"), as the sole residential parent.

**Substantive and Procedural History**

{¶2} Ms. Keen and Mr. Wilson had their first child ("D.W."), a son, in 2011. They married shortly over a year later, and the birth of their second child ("E.W."), a daughter, followed in the same year. They apparently lived together in Mr. Wilson's house for only a short time and spent much of the marriage separated and living in separate homes.

{¶3} In September 2012, Ms. Keen filed a complaint for legal separation with children in the Trumbull County Court of Common Pleas, Domestic Relations Division, and Mr. Wilson filed a complaint for divorce. After much discord, the parties agreed to an amended complaint for divorce. A separation agreement and shared parent plan were attached to the final decree, which was not filed for over five months after the final hearing.

{¶4} The agreement provided that neither parent would pay child support and acknowledged that Ms. Keen was relocating to Cuyahoga County with the children. In the shared parenting plan, the parties agreed they would alternate parenting time with the children every four days and that the residence for school purposes would be determined prior to D.W. beginning first grade.

{¶5} Ms. Keen moved to Parma, Ohio, to live with her ex-husband, Joseph Bassett. They have three children together: two daughters, both adults, as well as a son who is a year or two older than D.W. Ms. Keen also has an older son who was born before her marriage to Mr. Bassett. Mr. Wilson also has two daughters, both under the age of eighteen, from a previous marriage.

{¶6} After the final hearing, the case remained active before and after the final decree was filed. The guardian ad litem ("GAL") filed a contempt motion against Mr.

2

Wilson for failing to pay her fees. Mr. Wilson then filed a motion to hold Ms. Keen in contempt for failing to abide by the terms of the parenting time schedule.

**{¶7}** During a hearing on the GAL's fee motion before the magistrate on January 15, 2015, the magistrate found the parties had agreed to modify the shared parenting plan when D.W. was of school age, but there was no provision in the parenting plan as to the how the plan would be modified. A pretrial conference was scheduled to address this issue, but prior to the pretrial, both parties moved to terminate the shared parenting plan and to be named the residential parent. The magistrate reappointed the GAL and ordered her to continue her investigation and choose a counselor for the children. The magistrate further ordered the parties to continue the current parenting schedule and to meet at a fast food restaurant in Twinsburg to exchange the children.

**{¶8}** During the two-year period in which the motions to terminate the shared parenting plan were pending, the parties and the GAL filed a bevy of motions. Mr. Wilson filed a motion to show cause claiming Ms. Keen had restricted telephone access. He also filed motion for an order appointing Dr. Lynn DiMarzio as counselor for the children, which the court granted at Mr. Wilsons' expense.

**{¶9}** The GAL filed a motion to terminate Mr. Wilson's companionship/parenting time based on a report from Cuyahoga County Job and Family Services ("CCJFS"). CCJFS determined Mr. Wilson had told the children to allege that Ms. Keen's other child had inappropriately touched them when allegedly, it was Mr. Wilson's child who had done the touching. A similar allegation had been made against Ms. Keen's older children. In total, three investigations were conducted with no allegation of abuse substantiated for

3

any party or the parties' children. The record reveals reports to the agencies were made by mandatory reporters.

{¶10} The magistrate suspended Mr. Wilson's companionship time for a short period of time, ordered Dr. Robin Tener to perform a custody evaluation, and ordered continuing counselling with Dr. DiMarzio.

### *Motions to Terminate the Shared Parenting Plan*

{¶11} Final hearing on the termination of the shared parenting plan was continually delayed for various reasons: the magistrate retired, and a new magistrate assumed the case; Dr. Tener, the custody evaluator, became unavailable for months due to unforeseen circumstances; and Ms. Keen filed a motion to show cause against Mr. Wilson for failing to abide by the magistrate's visitation order.

{¶12} In August 2016, at a status conference, the magistrate issued a decision stating the parties had come to an agreement that D.W. would begin school in the Parma city school district. Companionship time was altered accordingly so that the children would spend the week with Ms. Keen and the weekends with Mr. Wilson. Trial was set for the beginning of December 2016.

{¶13} But there was a further delay; the trial was postponed to May 2017, and on two different occasions orders were entered regarding changes in parenting time. After both parties filed for continuances of trial, the matter was finally heard on October 10, 11, and 12, 2017, and January 19, 23, and 24, 2018.

### *The Testimony and Evidence During Trial*

{¶14} Dr. Tener submitted a 53-page report and testified as to the results of her custody evaluation. During 2016, Dr. Tener met with both parents individually and with

4

the children, as well as the significant other members of Ms. Keen's household. Dr. Tener administered psychological tests and reviewed relevant information provided by the parties; however, she had not seen the parties or the children since November 2016.

**{¶15}** As both parties acknowledged in their own testimony, which was reinforced by the testimony of the GAL, Dr. Tener found the largest problem between the parents was their inability to communicate. Dr. Tener recommended Ms. Keen become the sole residential parent with extended companionship time to Mr. Wilson, because she felt Ms. Keen would be more likely to facilitate communication and honor Mr. Wilson's parenting time. Dr. Tener felt the parties would benefit from dedicated, consistent usage of "OurFamilyWizard," a co-parenting application, which the magistrate had ordered them to use in June 2017.

**{¶16}** Dr. DiMarzio testified as a fact witness and primarily related information regarding her report of suspected abuse to Cuyahoga County Job and Family Services and her concerns regarding the supervision of the children while they were with Ms. Keen, specifically mentioning the type of videos the children watch, which are not age-appropriate.

**{¶17}** Both parties testified at trial as to their living arrangements and concerns about each other and the children. Their concerns about each other largely stemmed from miscommunication and/or lack of communication and the harm that may occur when the children are with the other parent. There were also conflicting communications regarding the children's baptism.

**{¶18}** Ms. Keen testified that she has worked for the Cuyahoga County Department of Job and Family Services for over 17 years, where she determines eligibility

5

for services such as Medicaid and food stamps. She works Monday thru Friday, 7:30 a.m. to 3:30 p.m. As already noted, Ms. Keen lives with her ex-husband in Parma, Ohio, and their three children, who are ages 7, 18, and 21. Including E.W. and D.W., there are seven people residing in her home.

{¶19} E.W. attended preschool three days a week, Monday, Wednesday, and Friday from 8:15 a.m. to 10:45 a.m. Ms. Keen's 18-year old daughter transported her to and from school. Ms. Keen took her lunch breaks at home to have lunch with E.W. D.W. was in the first grade and rode the bus to school. D.W. was selected in a random lottery to be in a STEM program (science, technology, engineering, and mathematics) for the first grade.

{¶20} Ms. Keen's ex-husband, Mr. Bassett, testified that E.W. and D.W. had never been left alone, his relationship with them was "wonderful," and that all of the children had a good relationship with each other.

{¶21} Mr. Wilson testified that he is an independent contractor, who typically works as a project superintendent for a highway and bridge building company. He works Monday through Friday, usually 8-10 hour days, starting at 6:00 a.m. Mr. Wilson is one of six children, who all reside in the Trumbull County area and are willing or have taken care of the children in the past when Mr. Wilson is at work. His parents live across the street, a brother is his next-door neighbor, and a sister lives down the street.

{¶22} Mr. Wilson further testified that he lives on a farm with farm animals. His two older daughters, one with special needs, lives with him on an alternating four-day companionship schedule with his ex-wife. Mr. Wilson's ex-wife, Tatiana Wilson, testified

6

that she and Mr. Wilson never had problems communicating or co-parenting with a shared parenting plan since their divorce.

{¶23} Mr. Wilson's sister-in law, Coryn Marie Wilson, testified that Mr. Wilson is an active, hard-working father. They both have watched each other's children in the past.

{¶24} The former vice-president of the Lordstown school board, which is the school district in which Mr. Wilson lives, testified as to the school district's performance in terms of its facilities, finances, and extracurricular activities.

{¶25} Mr. Wilson's mother, Mary Jane Wilson, also testified. She often takes care of the children before and/or after school. She was concerned about D.W.'s weight and some of E.W.'s inappropriate behavior. She observed both children are active when they stay with Mr. Wilson and watch only age-appropriate television.

{¶26} The GAL submitted her report and testified, recommending that the shared parenting plan be terminated, and Ms. Keen be designated as the residential parent for school purposes. She opined that the weekends with Mr. Wilson seemed to be working and that Ms. Keen should be given some weekend time. The GAL found that both were good parents and the children were bonded to both parents. The fundamental problem confronting this family was the parties' failure to communicate and inability to make joint decisions, along with the fact that the parties live over 70 miles away from each other. She also expressed concern about Mr. Wilson's practice of videotaping in his home and specifically videotaping the children while asking them leading questions.

{¶27} The GAL also observed that the children "don't know what is up or down or right or wrong or what happened because they hear one thing from one parent and one thing from another parent, one thing probably from the kids * * *. They're hearing different

7

stories from everybody and they're not going to be able to differentiate the truth then from that."

### *Pocket Dial Recordings*

{¶28} Two incidents of so-called "pocket dialed" cell phone calls were repeatedly addressed during the trial and are at the center of Ms. Keen's second assignment of error.

{¶29} Mr. Wilson began surreptitiously recording all his phone calls with Ms. Keen using an application on his phone. Several times, Ms. Keen "pocket dialed" Mr. Wilson without her knowledge that she had done so. A "pocket dial" occurs when the caller inadvertently dials her phone and the call connects without her knowledge. The specific application on Mr. Wilson's phone was not identified, but apparently it had the ability to record the conversation even when Mr. Wilson did not pick up the call. The application would "answer" all calls from Ms. Keen's number and immediately begin recording Ms. Keen's conversations with others in the background. Mr. Wilson recorded all of Ms. Keen's calls, but apparently only partially re-recorded and retained the two calls at issue.

{¶30} Two transcripts of partially recorded cell phone pocket dialed calls were admitted into evidence. The original recordings captured by the application were no longer available because Mr. Wilson no longer has that phone. The court reporter was provided with the partial re-recording of each call and a transcript was prepared, but it appears from a very confusing record that Mr. Wilson's attorney instructed the court reporter to transcribe only a portion of at least one of the re-recordings.

{¶31} Counsel for Mr. Wilson provided copies of the transcripts to opposing counsel and the GAL shortly before trial, and there is testimony that the GAL was able to listen to each recording in its entirety.

8

**{¶32}** During trial Ms. Keen was afforded the opportunity to listen to the recordings and compare them with the transcription. She identified her voice and agreed that the court reporter accurately transcribed what was on the recordings but repeatedly denied the conversation, saying she "can't remember everything."

**{¶33}** One call consisted of a male, later identified as Mr. Bassett, talking about leaving E.W. and D.W. home alone while Mr. Bassett took his son to school. Ms. Keen and one of their daughters were questioning him. The other call occurred when Ms. Keen returned home from picking up the children, and in the recording she informed Mr. Bassett that she had forgotten E.W.'s car seat.

### *How the Calls Were Used At Trial*

**{¶34}** Mr. Wilson's counsel questioned Ms. Keen about these incidents and then attempted to impeach her testimony with the statements made on the recordings.

**{¶35}** The court interjected and addressed counsel: "Well, I think the time to have this cross examination is when you admitted that exhibit into evidence. I mean, you've gotten the witness to testify that she has no recollection of it, so you have her right where you want her. Now if you're going to submit that into evidence, then we're going to determine her credibility. We don't need to beat it up."

**{¶36}** The following day cross-examination continued, and Mr. Wilson's counsel attempted to lay a foundation for the transcribed tapes. Ms. Keen's counsel objected, claiming the recording itself was the best evidence. The court reminded counsel that Ms. Keen heard the recordings and indicated during her testimony that she read the transcript and the transcription was accurate.

{¶37} Ms. Keen testified on redirect that the phone calls were incomplete conversations that "did not tell her a lot." She explained she was not aware she had called Mr. Wilson nor was she aware how the conversations were recorded. She was unaware she was being recorded, and Mr. Wilson never spoke during the pocket dialed calls to alert her she had inadvertently called him. She only recalled Mr. Wilson informing her via OurFamilyWizard she had pocket dialed him in September. She had no idea when the actual calls took place, and, further, replied: "And I asked Dan and he didn't know at that time either."

{¶38} After a brief recess, the court stated "[w]e are back on the record. We took a brief recess at the conclusion of the testimony of Ms. Keen. Her cross examination was just concluded. I had just heard some testimony about these tapes and/or the transcript. I have heard this through the Guardian and through Counsel for some time now, what I just heard has caused me some concern as to whether or not these tapes and/or the transcript of the tapes would be admissible." The court then ordered counsel to investigate the evidence and the question of whether the evidence should properly be before the court prior to trial resuming in January.

{¶39} The record is silent as to what transpired with the legal issues surrounding the tapes. No briefing was filed, and we do not have a record of any in-chambers discussion regarding any communications with the prosecutor that was mentioned at the conclusion of the last trial day in October.

{¶40} When trial resumed in January, Mr. Wilson explained on direct examination that he had received multiple pocket dial calls from Ms. Keen, only two of which were transcribed. Opposing counsel again objected on the grounds that the "best evidence

10

rule," Evid.R. 1002, required that the actual original recording be offered. The court overruled the objection and found enough of a foundation has been laid to admit the transcript because Ms. Keen testified she had an opportunity to read it and testified as to its accuracy.

{¶41} When Mr. Wilson testified in his case-in-chief and was questioned about the circumstances surrounding the recording about leaving the children alone in the morning, Mr. Wilson testified that he contacted his attorney when he heard this but did not call the police. Instead, he ended his job early and for three weeks afterward, drove to Ms. Keen's house every week day and watched everyone leave in the morning. He observed Ms. Keen leave first, then one of her daughters, followed by Mr. Bassett, their son, and lastly, their other daughter. Mr. Bassett would be gone for 20-35 minutes. A few weeks later, one of the older daughters started staying home later so he stopped watching the house in the morning.

{¶42} To rebut, Mr. Bassett testified the children were never left alone. He explained he did not always wake the babysitter before he left but someone was always there. He claimed that one of his daughter's friends would stay in the house while he drove his younger son to school. Regarding the second recording, Mr. Bassett testified Ms. Keen would never allow the children to be in a vehicle without car seats.

### Magistrate's Findings

{¶43} The magistrate conducted a post-hearing in-camera interview of each child and then issued a decision on February 26, 2018, which the court approved two days later. The magistrate determined it was in the best interests of the children to terminate the shared parenting plan and designate Mr. Wilson as the residential parent. Ms. Keen

11

was designated the non-residential parent and awarded the court's guideline schedule of parenting time. She was ordered to pay $200 per month as child support.

### *Ms. Keen's Motion for New Trial and Objections*

**{¶44}** Ms. Keen filed a motion for a new trial and objections to the magistrate's decision. Her motion for a new trial argued that at time of trial, the magistrate was a candidate in a judicial race. She claimed Mr. Wilson's attorneys were on the magistrate's campaign committee, and Mr. Wilson's mother was a precinct committee person from whom the magistrate was soliciting an endorsement. Mr. Wilson's mother also later put a sign in support of the magistrate in her yard. Ms. Keen argued the magistrate had a duty to disclose these relationships to avoid the appearance of impropriety and the specter of judicial bias. No documentary evidence was submitted with the motion for new trial nor was evidence supporting the motion proffered.

**{¶45}** In denying Ms. Keen's motion for a new trial, the court recognized there is a duty to disclose any relationship that exists in a judicial campaign. After an off-record status conference with counsel, the GAL, and a discussion with the magistrate, however, the court determined that the magistrate's campaign and the attorneys' involvement in the campaign took place after trial and after the magistrate issued his decision.

**{¶46}** In a lengthy and thorough opinion, the trial court overruled Ms. Keen's objections and found the magistrate's decision was not unreasonable, arbitrary, or unconscionable. The magistrate's decision and the court's review provided detailed consideration of all of the elements of R.C. 3109.04(F)(1) and (2), as well as the testimony and evidence presented by the parties. The court found naming Mr. Wilson as the residential parent would be in the best interests of the children.

12

**{¶47}** Ms. Keen now timely appeals, raising four assignments of error:

**{¶48}** "[1.] The trial court committed prejudicial error to Plaintiff-Appellant in failing to recuse the magistrate presiding over the proceedings when it was aware the appellee's co-counsels were active participants in the magistrate's election bid for judge, thereby creating both the appearance of impropriety and the spector [sic] of bias against appellant's case.

**{¶49}** "[2.] The trial court committed prejudicial error by admitting into evidence the partial transcript of a 'pocket dial' telephone call between Appellant and Joseph Bassett, Appellant's ex-husband, as it violated both Evidence Rule 1002 and Evidence Rule 106.

**{¶50}** "[3.] The trial court erred and abused its discretion by disregarding the relevant factors of R.C. 3109.04 by terminating the shared parenting plan and awarding Appellee legal custodian of the parties' minor children, as it was contrary to the best interest of the child.

**{¶51}** "[4.] The trial court abused its discretion by terminating the parties' shared parenting plan contrary to the recommendations of the guardian ad litem and Dr. Tener, the court appointed evaluator, and the magistrate's decision is against the manifest weight of the evidence."

### The Specter of Judicial Bias

**{¶52}** In her first assignment of error, Ms. Keen argues the trial court erred and abused its discretion in denying her motion for new trial because the magistrate failed to recuse himself when he was aware Mr. Wilson's attorneys were actively involved in his judicial campaign. Ms. Keen further argues that the magistrate solicited the endorsement

13

of Mr. Wilson's mother because she is a precinct committee person and Mrs. Wilson later placed a sign in her yard endorsing the magistrate.

**{¶53}** "This court reviews a trial court's judgment on a Civ.R. 59 motion for new trial under the abuse of discretion standard." *Lanzone v. Zart,* 11th Dist. Lake No. 2007-L-073, 2008-Ohio-1496, ¶66, citing *Effingham v. XP3 Corp.*, 11th Dist. Portage No. 2006-P-0083, 2007-Ohio-7135, ¶18. The term "abuse of discretion" is one of art, "connoting judgment exercised by a court, which does not comport with reason or the record." *In re K.R.,* 11th Dist. Trumbull No. 2010-T-0050, 2011-Ohio-1454, ¶29, citing *Gaul v. Gaul*, 11th Dist. Ashtabula No. 2009-A-0011, 2010-Ohio-2156, ¶24, citing *State v. Ferranto*, 112 Ohio St. 667, 676-78 (1925). Stated differently, an abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black Law's Dictionary* 11 (8th Ed.Rev.2004).

**{¶54}** "Thus, in reviewing a motion for a new trial we do so with deference to the trial court's decision, recognizing that 'the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the "surrounding circumstances and atmosphere of the trial."'" (Citations omitted.) *Lanzone* at ¶67.

**{¶55}** Furthermore, the decision whether to remove a magistrate lies within the discretion of the trial court. (Citation omitted.) *Lamont v. Lamont*, 11th Dist. Geauga No. 2005-G-2628, 2006-Ohio-6204, ¶16.

**{¶56}** We find no abuse of discretion in the trial court's judgment. In its judgment entry, the trial court stated that it "conducted a status conference with counsel, the GAL, and had discussion with the Magistrate and is satisfied that the campaign of the

14

Magistrate and the involvement of the attorneys in his campaign took place after the trial, and after the issuance of the Magistrate's Decision." We have no evidence from the record before us of any involvement by counsel in the campaign before or after trial or before the issuance of the decision, and Ms. Keen offered no evidence to substantiate the claims asserted in the motion for new trial.

{¶57} "Magistrates are judges within the meaning of the Judicial Code of Conduct." *Lingenfelter v. Lingenfelter*, 9th Dist. Wayne No. 14AP0005, 2015-Ohio-4002, ¶9. *See* Judicial Conduct Application I(B). And, as the trial court noted, Ms. Keen is correct in her assertion that "[a] judge should disclose on the record information that the judge believes the parties, or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." *Lingenfelter* at ¶9, citing Jud.Cond.R. 2.11, Comment 5.

{¶58} The test for determining whether a judge's participation in a case presents an appearance of impropriety is objective. That is, "[a] judge should step aside or be removed if a reasonable and objective observer would harbor serious doubts about the judge's impartiality." *Id.* at ¶11, citing *In re Disqualification of Farmer,* 139 Ohio St.3d 1202, 2014-Ohio-2046, ¶7.

{¶59} Moreover, in the case of judicial campaigns, "it is well established that judges generally are not disqualified 'merely because a party to or lawyer in the underlying case campaigned for or against the judge.'" *In re Disqualification of Burt*, 145 Ohio St.3d 1239, 2015-Ohio-5670, ¶6, citing *In re Disqualification of Celebrezze*, 74 Ohio St.3d 1231, 1232 (1991).

**{¶60}** Thus, even in cases where a lawyer actively campaigned for a judge who is presiding over his or her case after the election, more is required than simply support of a candidate in an election. "Judges are presumed to be able to set aside any partisan interests once they have assumed judicial office and have taken an oath to decide cases on the facts and the law before them." (Citation omitted.) *Id.* at ¶6.

**{¶61}** All of these circumstances are absent from the present case. Any involvement of Mr. Wilson's attorneys, as well as Mr. Wilson's mother, took place *after* the trial and issuance of the magistrate's decision. The timing of the case assures any decision on the part of the magistrate was free from judicial bias and any appearance of impropriety. A reasonable and objective observer evaluating the record evidence would not question the magistrate's ability to preside fairly and impartially over this case.

**{¶62}** Ms. Keen's first assignment of error is without merit.

### Pocket Dials – An Evidentiary Blunder?

**{¶63}** In her second assignment of error, Ms. Keen takes issue with only one of the pocket dial recordings (Ex. 1—the "car seat" call) in that it was a partial transcript of an apparently partial recording of the original call, in violation of Evid.R. 1002, the "best evidence rule," as well as Evid.R. 106, the "rule of completeness." We note we have been presented with a very confusing record regarding this issue of the recorded conversations. It is apparent that discussions regarding these recordings were had off the record. What details we do have in this record regarding the circumstances and means of the original recording, the apparent subsequent re-recording of all or portions of each recorded call, the transcription of the calls, the pretrial disclosure of the recordings, and any consideration of the recordings' propriety, are very incomplete.

16

**{¶64}** We review a judgment of the trial court adopting the decision of its magistrate for an abuse of discretion. (Citation omitted.) *In re K.R.* at ¶28. Furthermore, we review a judge or magistrate's decision to admit or exclude evidence under an abuse of discretion standard. *Davis v. Killing*, 171 Ohio App.3d 400, 2007-Ohio-2303, ¶11 (11th Dist.), citing *Calderon v. Sharkey*, 70 Ohio St.2d 218, 219 (1982); *State v. Sledge*, 11th Dist. Trumbull No. 2001-T-0123, 2003-Ohio-4100, ¶20. The term "abuse of discretion" is one of art, "connoting judgment exercised by a court, which does not comport with reason or the record." (Citations omitted.) *In re K.R.* at ¶29. Stated differently, an abuse of discretion is the "trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" (Citation omitted.) *Beechler* at ¶62.

**{¶65}** "A trial court's determination as to the admissibility of evidence is generally a matter within the sound discretion of the trial court. *Davis* at ¶11, citing *Shaffter v. Ward*, 17 Ohio St.3d 79, 80 (1985). "Therefore, unless a trial court has clearly abused its discretion and a party has been materially prejudiced, the trial court's determination will not be reversed on appeal." *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

### *The Legal Issues Surrounding a Pocket Dial Recording*

**{¶66}** At the outset, we would be remiss not to address the silent question lurking in the background, which is whether the pocket dial recordings, made by intentionally programming a phone application to record all incoming calls by another party, inadvertent or intentional, are to be considered the latest technical advancement in illegal "wiretapping?" Both parties in this case utilized surreptitious surveillance and recording devices. Mr. Wilson also videotaped his children. These practices were of concern to at least Dr. Tener and the GAL and are of great concern to this court.

**{¶67}** Federal and Ohio law is well settled that placing a recording device on one's phone to secretly record the calls of another household member when one is not a party to the call is illegal. *See Hodges v. Hodges*, 175 Ohio App.3d 121, 2008-Ohio-601, ¶43 (6th Dist.), citing 18 U.S.C.S. 2510 et seq. and R.C. 2933.51 through 2933.66 (where "[a]ppellant's suspicions of his wife's extramarital activities do not serve as a defense to illegal wiretapping. The fact that his suspicions were well founded does not negate his guilt").

**{¶68}** *U.S. v. Wuliger*, 981 F.2d 1497 (6th Cir.1992) illustrates the inherent dangers of using surreptitious recordings in the domestic relations arena where the one recording the call is not a party to the call. In *Wuliger,* an attorney who represented the husband in a divorce action used contents of tape recorded telephone calls from the marital residence to impeach both the wife's testimony and that of her paramour; and to cross-examine the wife regarding concealed marital assets. *Id.* at 1500. The husband was not a party to the conversations. *Id.*

**{¶69}** The attorney was convicted for multiple violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1961, 18 U.S.C. 2510-2520. *Id.* The Sixth Circuit held there was no impeachment exception for the use of illegally obtained wiretap evidence in a civil case between the parties. *Id.* at 1506. It ultimately reversed the appellant's conviction on other grounds, but the cautionary tale remains. *Id.*

**{¶70}** Pocket dial calls, however, present a slightly different scenario, which is described in the Sixth Circuit's ruling in *Huff v. Spaw*, 794 F.3d 543 (6th Cir.2015). Mr. Huff inadvertently pocket dialed his boss, Spaw, and made numerous disparaging and allegedly discriminatory remarks about Spaw's supervisor. *Id.* at 546. With the phone

call continuing, Mr. Huff then went to his hotel room where he discussed these conversations as well as personal matters with his wife. *Id.* Spaw and a co-worker listened for the entire 90 minutes, took notes about the work-related conversations, and used an iPhone to record the last four and a half minutes of the Huffs' hotel room conversation. *Id.*

{¶71} The Sixth Circuit applied the reasonable-expectation of privacy test from *Katz v. U.S.*, 389 U.S. 347 (1967): "(1) whether a person exhibited an expectation of privacy and (2) whether that expectation was reasonable." *Id.* at 550. For the first inquiry, the person must "*exhibit* an intention to keep statements private. A person fails to exhibit an expectation of privacy under the *Katz* test if he *exposes* those statements to the 'plain view' of outsiders * * * or if he fails to take steps to prevent exposure to third parties." (Emphasis sic.) (Citations omitted.) *Id.* "The second part of the *Katz* test is satisfied if the expectation of privacy exhibited by the person is reasonable under the circumstances." *Id.*

{¶72} The Sixth Circuit determined that the test must be applied to Mr. and Mrs. Huff separately. *Id.* Thus, Mr. Huff, exposed his activities and statements, "thereby failing to exhibit an expectation of privacy, by inadvertently sharing his activities and statements through neglectful use of a common telecommunications device." *Id.* Mrs. Huff, however, "exhibited an expectation of privacy in statements she made to her husband in the hotel room, unless she exposed these statements to an outsider as her husband did." *Id.* at 553. Thus, "speaking to a person who may carry a device capable of intercepting one's statements does not constitute a waiver of the expectation of privacy in those statements." *Id.*

**{¶73}** The court affirmed the district court's judgment finding that Mr. Huff's statements did not qualify as oral communications for Title III purposes because he exposed them to Spaw when he pocket-dialed her, but reversed and remanded for further proceedings as to Mrs. Huff's statements because she could not be "held responsible for her husband's pocket-dial." *Id.* at 556.

**{¶74}** The present case challenges the state of the law and presents a predicate question a court should consider regarding admissibility of the recordings or transcripts of the recordings.

**{¶75}** Ms. Keen was inadvertently calling Mr. Wilson. Mr. Wilson was intentionally recording all of her calls, whether inadvertently dialed or not, and by his own testimony regarding the two calls at issue, Mr. Wilson admits he did not pick up the call; his phone's application intercepted and recorded the calls. Mr. Wilson was not an active participant in the recorded conversations.

**{¶76}** Mr. Bassett and his daughter had an expectation of privacy pursuant to *Huff* regarding their statements that Mr. Wilson recorded. This begs the question whether Ms. Keen had an expectation of privacy in her inadvertent pocket dialed calls when Mr. Wilson intentionally set all of her calls to record and did not even answer those calls.

**{¶77}** Neither party or the court addressed on the record the potential legal issues of the pocket dial recordings and it was not raised in this appeal, so we need not answer the question just posed. From the cryptic references in the record before us regarding investigation into the admissibility of the recordings and possible communication with the prosecutor, we will presume all were satisfied that the recordings were properly made. But, as we noted in a previous case, if we did not raise the issue, albeit as a cautionary

20

measure, havoc will surely follow when parties use and test the limits of ever-advancing technology in their quest to document each other's bad acts, reminding us of the law school adage, "bad cases make bad law." *Keyerleber v. Keyerleber*, 11th Dist. Ashtabula No. 2007-A-0009, 2008-Ohio-2131, ¶42 (Trapp, J., concurring).

### The Best Evidence Rule – Evid.R. 1002

**{¶78}** Returning to the assigned error, Ms. Keen contends that the introduction of the partial transcript of the "car seat" pocket dial recording was in error because the original recording itself is the best evidence of the call. We disagree because Ms. Keen authenticated the transcript as to its accuracy. The actual content of the recording (and whether it differed from the transcript) was not at issue. Rather, the call was used for Ms. Keen's prior inconsistent statement to contradict her testimony that she never left the children's car seats at home, putting their safety at risk on the highway in violation of state motor vehicle laws. The content of the call, as to its accuracy, was never in question, despite Ms. Keen's objection at the time of trial.

**{¶79}** Evid.R. 1002, "Requirement of original," provides in pertinent part: "[t]o prove the *content* of a writing, recording, or photograph, the original writing, recording, or photograph is required * * * ." (Emphasis added).

**{¶80}** Professor Giannelli in 2 Baldwin's Oh. Prac. Evid.R. 1002 (3d Ed.) perhaps best explains the nuances of this rule: "The rule applies only when a party attempts to prove the contents of a writing or recording. Typically, this occurs (1) when the event to be proved is a written transaction, (2) when a party chooses a written method of proof, or (3) a witness's knowledge derives solely from having read a document." *Id.* at 1002.4.

21

**{¶81}** He further states: "Rule 1002 *does not apply* when the event sought to be proved existed independently of a writing, even if that event has been recorded. * * * For example, if an accused makes an oral confession which is recorded or subsequently reduced to writing, the rule does not apply. The prosecution is not attempting to prove the contents of the recording or writing, but rather the independent event (oral confession) that happened to be recorded." (Emphasis added.) *Id.*

**{¶82}** The proper foundation for the pocket dial transcript was laid by Ms. Keen's own testimony. Ms. Keen listened to the audio recording, read the transcript, and then testified it was an accurate transcription of the recording. The pocket dial call was introduced to contradict Ms. Keen's testimony that she did not forgot the child's car seat on one occasion. The actual content of the transcript versus the recorded call was not at issue. Thus, the court stated: "She has testified that she has had an opportunity to read the transcript and she's testified that the transcript is accurate. So, as far I'm concerned, if you wish to submit that transcript, you can submit that transcript."

**{¶83}** The following colloquy also demonstrates the accuracy of the transcript as compared to the recording:

**{¶84}** "The Court: Did you listen to the tape?

**{¶85}** "Ms. Keen: I did.

**{¶86}** "The Court: Okay. Did you review the transcript purported to be of the tape?

**{¶87}** "Ms. Keen: I did.

**{¶88}** "The Court: And did you not indicate that it accurately reflects what was on the tape?

**{¶89}** "Ms. Keen:  Yes.

**{¶90}** "The Court:  That's all I need to know."

### *Partial Recordings and Partial Transcripts*

**{¶91}**  Ms. Keen next contends that the court erred by admitting only a partial transcript of a partial recording of the original pocket dial recording, citing the "rule of completeness," Evid.R. 106.  The following colloquy demonstrates this perplexing evidentiary quandary:

**{¶92}** "The Court:  The bottom line, the bottom line, I know there are other things on the tape.

**{¶93}** "Ms. Keen:  Yes.

**{¶94}** "The Court:  Did you have an opportunity to hear the other things on the tape?

**{¶95}** "Ms. Keen's counsel:  No.

**{¶96}** "Ms. Keen:  No.

**{¶97}** "The Court:  Then I note your objection.  I note that.

**{¶98}** "* * *

**{¶99}** "Mr. Wilson's counsel:  – is there anything on any tape that you received as a butt call that would exonerate your wife and her, your ex-wife, and her behavior in either episode?

**{¶100}** "Mr. Wilson:  Absolutely not."

**{¶101}** Mr. Wilson explained to the court that the court reporter transcribed the pocket dial recordings.  He was "not at all" happy with the cost, and that is why he agreed with his attorney not to "type the whole doggone thing" despite the fact that the actual

23

recording went on for some time and caught discussions about other matters apart from the car seat. Mr. Wilson further testified that the GAL heard all the recordings in their entirety, he discussed them with her, and he claimed he was not hiding anything when he did so.

{¶102} There is no evidence in this record that Ms. Keen or her counsel heard the entire recording. While we find this a troubling explanation of why Ms. Keen was not given the complete recordings or complete transcripts of the pocket dial recordings, we have no proffer of what else was on the tape in order to assess whether the entire recording or transcript of the entire recording should have been admitted.

{¶103} Pursuant to Evid.R. 106, "Remainder of or related writings or recorded statements," "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it."

{¶104} Without any question, the remaining portions of the recording (and/or transcript) should have been introduced if a complete recording existed, if Ms. Keen was aware of the contents, and if relevant. But it is up to the party requesting completeness to demonstrate the need for completeness. *See State v. Holmes*, 77 Ohio App.3d 582, 585 (11th Dist.1991) ("Given these requirements it follows that the adverse party must do more than simply move for the introduction of the entire document. Instead, the adverse party has the burden of showing that the additional part is not only admissible, but relevant to the portion which the party seeks to introduce, *i.e.*, '* * * and which ought in fairness to be considered contemporaneously with it.' Evid.R. 106").

{¶105} As troubling as this evidentiary quandary is, even if we were to find error, it would be harmless error since the content of the call (or even the surrounding circumstances) were not at issue. The purpose of using the call was to contradict Ms. Keen's testimony. Even if admission of Ms. Keen's prior inconsistent statement, i.e., the "car seat" pocket dial recording, was in error, the car seat incident was not the pivotal deciding factor underlying the magistrate's decision and the trial court's judgment.

{¶106} Ms. Keen's second assignment of error is without merit.

**Standard of Review in Parental Rights and Responsibilities Cases**

{¶107} "This court has held that decisions involving the custody of children are accorded great deference on review." *In re K.R.* at ¶28, citing *Bates–Brown v. Brown,* 11th Dist. Trumbull No. 2006-T-0089, 2007-Ohio-5203, ¶18, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Thus, any judgment of the trial court involving the allocation of parental rights and responsibilities will not be disturbed absent a showing of an abuse of discretion. *Id.*, citing *Davis v. Flickinger,* 77 Ohio St.3d 415, 418 (1997). Further, we review a judgment of the trial court adopting the decision of its magistrate for an abuse of discretion. *Id.,* citing *Rutherford v. Rutherford,* 11th Dist. Portage No. 2009-P-0086, 2010-Ohio-4195, ¶10. In addition, an appellate court reviews the trial court's termination of a shared parenting plan for an abuse of discretion. *Id.*, citing *Matis v. Matis,* 9th Dist. Mahoning No. 04CA0025–M, 2005-Ohio-72, ¶4.

{¶108} "The highly deferential abuse-of-discretion standard is particularly appropriate in child custody cases since the trial judge is in the best position to determine the credibility of the witnesses and there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record. In so doing, a reviewing

25

court is not to weigh the evidence, 'but must ascertain from the record whether there is some competent evidence to sustain the findings of the trial court.'" *In re K.R.* at 30, citing *Wyatt v. Wyatt*, 11th Dist. Portage No. 2004-P-0045, 2005-Ohio-2365, ¶13.

### *Termination of Shared Parenting Plan*

{¶109} In her third assignment of error, Ms. Keen argues the court disregarded the relevant statutory factors and that the manifest weight of the evidence does not support the court's judgment terminating the shared parenting plan and naming Mr. Wilson as the residential parent.

{¶110} A review of the magistrate's decision and the trial court's judgment, however, reflects the magistrate and the trial court properly considered all of the best interest of the children factors of R.C. 3109.04(F)(1)(a)-(j) and R.C. 3104(F)(2)(a)-(e), and further demonstrates each finding is supported by competent and credible evidence.

{¶111} Ms. Keen first argues that the magistrate improperly interviewed the children and weighed D.W.'s wishes and/or concerns because both the GAL and Dr. Tener testified the children would probably not have the ability to reason. She also argues the transcript does not support certain findings about E.W.'s inappropriate behavior and D.W.'s bruising.

{¶112} Neither party requested that the in camera interviews be recorded; thus, we do not have a transcript of the interviews to review. We presume the magistrate conducted the interviews according to the statutory requirements and from our review of the magistrate's findings, we do know that he determined the older child did have sufficient reasoning abilities to express his wishes and desires while the younger child did not. The magistrate specifically considered the different ages and reasoning abilities of

the children, who were five and one week shy of seven years of age. And it must be noted that Dr. Tener had not seen the children for over a year before her trial testimony.

{¶113} The magistrate explained that the oldest child, D.W., wanted to reside with his father, adding D.W. "strongly wants to reside with his father for very legitimate reasons" and that he "truly enjoys the farm and the overall living situation at his father's house." The magistrate confirmed in his discussion with D.W. that the cause for E.W.'s dancing/twerking behavior was learned behavior from observing Ms. Keen's older daughters, and he also confirmed the source of the bruises on D.W.'s body was Ms. Keen's younger son.

{¶114} Ms. Keen next argues that the "testimony reveals an absence of any issue" in regards "to the minor children being unsupervised while in the care of Appellant." Leaving aside the substance of the "pocket dial" calls, as addressed in the second assignment of error, Mr. Wilson testified that for three weeks after he received one of the pocket dial calls, he drove to Parma and observed everyone, except D.W. and E.W., leave Ms. Keen's home in the morning. This led him to conclude no one was watching his children. Both Ms. Keen and Mr. Bassett could not recall leaving the children unsupervised. The magistrate was free to weigh the evidence and determine whose testimony was more credible. Critically, the concern about leaving the children alone while they were in their mother's care was only one factor in the overarching concern about a lack of appropriate supervision and positive role models afforded by those living in the mother's home as compared to that afforded by their father, his children, and his extended family. There was evidence in the record regarding the age-inappropriate

27

videos the children watched at the mother's home with the older half-siblings and E.W.'s learned behavior from watching her older half-siblings.

{¶115} Ms. Keen also raises issues with the magistrate's finding relative to the children's adjustment to home, school and community. She specifically takes issue with the finding that "the STEM program in Parma chose [D.W.] on a random basis." The evidence in the record supports this determination. Ms. Keen, herself, testified D.W. was "picked in his first year when starting kindergarten. They have a lottery." When asked, "So there was no actual testing or anything like that?" Ms. Keen replied, "No," and described it as akin to "winning the lottery." The magistrate therefore noted that because the child was not selected for the school on merit, there is nothing in the record to demonstrate a special need or value to the child remaining in that particular school.

{¶116} Moreover, the former vice-president of the Lordstown school board testified that the Lordstown schools are fiscally sound and described the school's facilities and extracurricular activities. Ms. Keen testified that she received a letter from the Parma schools describing its fiscal difficulties. Based upon this evidence, the magistrate found that "the Lordstown Schools are physically and financially much better than the Parma schools. There is also a benefit to [D.W. and E.W.] that they have friends at Lordstown, and that the student teacher ratio is smaller, which would appear to benefit [D.W.]."

{¶117} The magistrate's findings that the children interacted well with Mr. Wilson's family and his concerns regarding their interactions with Ms. Keen's family were supported by the evidence. Although both parties made allegations of abuse against the other, none of these allegations or investigations of the children services board were ever substantiated. As previously noted, the record reveals the children were exposed to

adult-like behavior by two of the older children at Ms. Keen's home, including movies, inappropriate language, and video games.

**{¶118}** As to D.W.'s dietary needs and lifestyle, Ms. Keen testified D.W. goes to wrestling during the school year. Ms. Keen lives in a small home in the city with seven individuals. D.W. has a four-wheeler at Mr. Wilson's, lives on a farm with animals, and is actively outside much of the time. Each child has his or her own bedroom in Mr. Wilson's home, and there are family members both next door and across the street to help with child care. There was also testimony as to the children's diets and meals, as both parents were concerned about their son's rapid weight gain.

**{¶119}** Quite frankly, the record reveals competing testimony as to each of the specific points Ms. Keen raises. Simply because the magistrate choose to find Mr. Wilson's evidence and testimony more credible than hers does not mean a manifest injustice has occurred.

**{¶120}** "When assessing witness credibility, 'the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' *State v. Awan* (1986), 22 Ohio St.3d 120, 123. 'Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it.' * * * If the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *Id.*" (Internal citation omitted.) *In re K.R.* at ¶68.

**{¶121}** After a thorough and complete review of the record, we cannot say the magistrate's decision and the trial court's extensive judgment terminating the parties' shared parenting plan and declaring that it was in the children's best interest that Mr.

29

Wilson serve as their residential parent were not supported by competent and credible evidence.

**{¶122}** Ms. Keen's third assignment of error is without merit.

### *Expert Testimony as Against the Manifest Weight of the Evidence*

**{¶123}** Lastly, Ms. Keen contends the judgment below is against the manifest weight of the evidence because it is contrary to the recommendations of Dr. Tener, the court appointed evaluator, and the GAL. We disagree.

**{¶124}** Dr. Tener evaluated the parties in October of 2016. D.W. was just beginning kindergarten and E.W. was in preschool. Dr. Tener gave both parents psychological tests with mixed results. Ms. Keen's tests were not valid since she was defensive and tried to paint herself in a better light. Mr. Wilson was more forthcoming, but also defensive, and responded to questions using his disabled child from a previous marriage as an example, so his results were not applicable. Both parties submitted background histories and documents they believed to be pertinent to Dr. Tener.

**{¶125}** Dr. Tener found both parents have strong relationships with their children, and that despite the parent's problems communicating with each other, the children were thriving developmentally, educationally, and emotionally. Both parents had a "strong propensity to interpret their children's statements/behaviors in ways that immediately draw the conclusion that harm (of one sort or another) is occurring/going to occur at the other parent's residence," and both parents assigned blame to the other for their worries about the children. Neither parent was motivated to continue shared parenting due to "problems with conjoint decision-making." Dr. Tener noted Mr. Wilson's difficulty accepting medical opinions and adhering to the parties' companionship schedule.

30

{¶126} Dr. Tener recommended Ms. Keen should be named full custodian and residential parent with the same parenting schedule the parties were currently following. That is, the children would remain with Ms. Keen during the week, and spend the weekends with Mr. Wilson. She also recommended a more flexible schedule to allow Ms. Keen to have parenting time on the occasional weekend and suggested alternative weeks during summer vacation.

{¶127} Dr. Tener's evaluation and report did not consider whether the children were being left unsupervised at Ms. Keen's, as that is a circumstance that occurred later.

{¶128} Similarly, the GAL testified as to the parties' history and respective parenting relationships. The GAL found Mr. Wilson to be less than truthful as a result of a Father's Day/Mother's Day parenting schedule incident and Ms. Keen to be more likely to honor parenting time. The GAL believed Ms. Keen more willing to admit when she is wrong and to take corrective action. The GAL noted there was a civil protection order between Ms. Keen and Mr. Basset in 2008, which expired. She also found that neither parent substantially denied the other parenting time. Rather, they engaged in "disagreements over exchanges or adjustment of the schedule." Finally, she observed the parents do not live in close proximity to one another and cannot communicate.

{¶129} The magistrate found Dr. Tener's evaluation "process was compromised due to father feeling he was unable to present all of his pertinent information to Dr. Tener; and his only having two (2) sessions, when mother appears to have four (4) sessions. There was also the debate that came to light during the trial as to whether information that predated the last custody order could be considered. Dr. Tener indicated that she does want information that may predate the last custody order so that she has a better

understanding of the baseline when the last order was issued. Father was confused and was led to believe that he was precluded from presenting this information even though mother did present this information."

{¶130} The magistrate determined there was actually no evidence that "either parent denied the other parent visitation except for differences in the interpretation of their in-Court agreement." As to Dr. Tener's specific concern that Mr. Wilson denied Ms. Keen companionship time during those dates and that Mr. Wilson violated a court order, the magistrate observed "the testimony established that there were inconsistent orders, and/or that father had not yet received notice of said orders. The parties each appeared to be trying to 'one up' the other, and father the ability to communicate was in essence non-existent." Mr. Wilson testified he mixed up the companionship times on Father's Day/Mother's Day due to using the court recommended schedule as opposed to the parties' shared parenting plan.

{¶131} Moreover, Ms. Keen contradicted her own testimony in several instances during the trial. She could not recall leaving E.W.'s car seats at home or leaving them unsupervised. She testified D.W.'s grades were outstanding when they were satisfactory, and she arranged for the children to be baptized without any input or communication with Mr. Wilson.

{¶132} Thus, the magistrate found "there has NOT been any substantiated abuse in this case. However, there does appear to be some question as to the overall supervision of [D.W. and E.W.] at mother's house. This is being raised due to concern that the minor children appear to have been left alone. [Ms. Keen's two older daughters]

32

appear to be the reason/cause of [E.W.'s] inappropriate behavior, i.e. twerking/humping, and [Ms. Keen's younger son] appears to be the cause of the bruising on D.W."

{¶133} In sum, it is clear the court below weighed all the testimony and evidence in this case in determining the best interests of the children. There is contradicting testimony from both parties, Dr. Tener, and the GAL, as well as an information/observation gap caused by the passage of time between interactions with the experts and the start of trial.

{¶134} As noted above, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." (Citation omitted.) *In re K.R., supra,* at ¶68.

{¶135} We cannot say the magistrate so lost his way or that a manifest injustice occurred because the manifest weight of the evidence supports the magistrate's determination, and we agree with the trial court that the magistrate's decision was not "unreasonable, arbitrary, or unconscionable."

{¶136} Ms. Keen's fourth assignment of error is without merit.

{¶137} The judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, is affirmed.


THOMAS R. WRIGHT, P.J.,

MATT LYNCH, J.,

concur.